LEONARD RUBIN AND JUDITH RUBIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rubin v. Commissioner
Docket No. 1453-85
United States Tax Court
T.C. Memo 1989-484; 1989 Tax Ct. Memo LEXIS 484; 58 T.C.M. (CCH) 25; T.C.M. (RIA) 89484; September 5, 1989; As corrected September 6, 1989; As corrected September 14, 1989 William Conroy, for the petitioners. John Ferrante, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined deficiencies in petitioners' [1] Federal income tax and additions to tax as follows: Addition to Tax
Year
Deficiency
Section 6661(a) [2]
1980
$ 12,892
--
1981
35,624
--
1982
31,096
$ 3,110
*487 In an amended answer to the petition, respondent asserted increased interest, pursuant to section 6621(c)(1), [3] with respect to interest accruing after December 31, 1984. The issues for decision are: 1) whether petitioner's purchase and lease of computer peripheral equipment constituted a tax-avoidance scheme devoid of economic substance which should be disregarded for Federal income tax purposes; 2) whether petitioner acquired the benefits *488 and burdens of ownership in the equipment; 3) whether petitioner's investment constituted an activity entered into for profit within the meaning of section 183; 4) whether petitioner was at risk within the meaning of section 465 with respect to debt obligations he incurred in connection with his purchase of the equipment; 5) whether there was a substantial understatement in petitioners' 1982 income tax such that petitioners are liable for the addition to tax pursuant to section 6661(a); and 6) whether the purchase and lease transactions were tax motivated transactions such that petitioners are liable for increased interest pursuant to section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Oyster Bay Cove, New York, at the time their petition was filed. General Background
Petitioner received a Bachelor of Arts degree in accounting from Bernard Baruch College. He has been employed by Wren Distribution Corp., Inc. (Wren) for over 20 years. During the years in issue, he served as Wren's vice president in charge of *489 sales; at the time of trial, he was its Chief Financial and Chief Operating Officer. Wren is an electronics distributing company and is the exclusive distributor for Commodore computers in New York. Petitioner, who took several computer courses in college, participates in Wren's computer purchasing decisions. Petitioner has experience in a broad array of investments; he has participated in decisions regarding investments in restaurants, cattle, a casino, drug stores, co-op conversions, movies, and oil and gas. In 1983, petitioner was involved in the organization of a computer distributing company, Abraham Portnoy, Inc. (API). While petitioner relies on his own judgment in making financial decisions, to a large extent he also relies on the judgment of two of his friends and business associates, Howard Weingrow (Weingrow) and Robert Lifton (Lifton). Lifton, who describes himself as an entrepreneur, received a Bachelor's degree in Business Administration and attended Yale Law School, where he received an LL.B. degree. He has taught at Columbia and Yale Universities and has published a book about the taxation and business aspects of real estate. [4]
*490 Petitioner has known Weingrow and Lifton for approximately 15 years and has engaged in 12 to 15 business deals with either or both of them. Lifton and Weingrow were also involved in API, which was formed to take advantage of the group's knowledge of computer equipment. The vast majority of the deals in which petitioner has engaged in with Lifton, Weingrow, or both have been financially successful. The Computer Leasing Transaction -- Background
In 1980, Lifton was approached by AARK Enterprises (AARK) and presented with the opportunity to purchase IBM computer equipment which AARK had purchased from DPF, Inc. (DPF). AARK began as a joint venture in 1978 between Kenard Resource Development Corporation and Rapetti Resources Incorporated and was later incorporated in 1981. AARK was founded to structure leveraged lease transactions, and in 1979 it placed approximately $ 50 million of computer equipment and aircraft with closely held and publicly held corporations. Lifton and Weingrow recommended the investment to petitioner. They believed that the purchase of computers would be a good hedge against inflation. Before recommending the investment to petitioner, Lifton *491 and Weingrow spent hours reviewing the proposed purchase and lease transaction to determine what could go wrong with the investment. Lifton reviewed literature regarding the equipment involved in the transaction, as well as other brands of computers. He contacted people he knew in the industry and reviewed reports by investment banking houses with respect to the computer industry in order to discern industry trends. Lifton also contacted a friend of his, a director of DPF, regarding the financial condition of DPF; based upon this discussion, he felt that DPF was financially sound. Prior to purchasing any computer equipment, petitioner reviewed several other transactions between AARK and other purchasers. All of these other transactions involved computer equipment which was purchased subject to end-user leases and included the purchase of mainframes. Although the equipment petitioner contemplated purchasing was also subject to an end-user lease, petitioner wanted to purchase peripheral equipment rather than a mainframe computer because he did not think that peripheral equipment would become obsolete as quickly as a mainframe. Thus, petitioner believed that through the purchase *492 of peripheral equipment, he would be assured of the receipt of rental income for a greater length of time than if he had purchased a mainframe. In evaluating the contemplated purchase and leasing transaction, petitioner read literature regarding AARK as well as a book about leveraged leasing. He analyzed the forecasts of residual values of the equipment, the projections of cash flow and income from the base rent and from rent participation with DPF, and tax savings and benefits. He reviewed and analyzed the purchase agreement, user lease, security agreement, opinion of counsel, and other documents regarding the transaction. Petitioner reviewed an appraisal prepared by John R. Wilkins, president of Communigraphics, Inc. (Communigraphics), a broker and dealer in the purchase, sale and lease of IBM computer equipment. Communigraphics appraises small and intermediate sized IBM computers. [5] Mr. Wilkins estimated that the equipment would have a residual value of $ 346,464 at the end of the term in July 1983, and $ 124,600 10 years from petitioner's purchase of the equipment (November 1990). Thus, according to the appraisal, the equipment would retain 20 percent of its purchase price *493 as of 1990. Petitioner felt confident with respect to the parties to the transaction, i.e., the end user, J. C. Penney Co., Inc. (J. C. Penney), and DPF. Lifton had been aware of DPF since the 1960's and knew its three founders. DPF was a major leasing company during the 1970's; by the 1980's its prominence had diminished somewhat. Petitioner considered DPF to be a "substantial" company and felt that his payments from J. C. Penney were secure. On November 28, 1980, petitioner, acting on the advice of Weingrow and Lifton and as a result of his own investigative efforts, purchased a one-third interest in 17 units of IBM computer equipment from AARK for $ 207,502. The remaining two-thirds interest in the equipment was purchased by investors that petitioner knew, which bolstered petitioner's confidence in his decision to purchase the equipment. The 17 units of equipment included 15 units of IBM model 3350 disk drives and two 3830-2 control panels. The *494 IBM model 3350 disk drives are peripheral devices used to store data for central processing units, and the IBM model 3830-2 control panels, also peripheral devices, are used to control storage disk drives, such as the IBM model 3350. At the time of petitioner's purchase, the equipment was on lease to an end user, J. C. Penney Company, Inc. (J. C. Penney). The lease, which was executed on July 16, 1980, and was for a period of 36 months, required monthly payments of $ 13,655 per month. Parties to an AARK Leveraged Lease Transaction
There are five parties in a typical AARK leveraged lease transaction: the end-user, the lender that lends against an assignment of the lease, the leasing company, AARK, and the equity owner. The end-user, in this case J. C. Penney, has use of the equipment for a fixed period of time, pursuant to a lease. The lender is a financial institution that lends against an assignment of the lease rentals and the lease, plus a first mortgage on the equipment. The leasing company, DPF, purchases the equipment, arranges the bank loan, places the equipment in service with the user, administers all user leases, and remarkets the equipment. AARK purchases *495 the equipment from the leasing company, maintains an inventory of equipment on lease to others, and provides administrative services during the life of the lease. The equity owner, [6] petitioner in this case, purchases the equipment from AARK and, as owner, accrues all tax benefits associated with ownership, as well as the potential to realize a profit from sharing in both lease rental income and the residual value of the equipment. Structure of Petitioner's Transaction
There are three distinct steps in an AARK leveraged lease transaction which were also followed in this case. 1. The Leasing Company's Purchase of the Equipment
The first step involves the leasing company's (DPF's) purchase of equipment from the manufacturer (IBM). The leasing company then places the equipment in service with the user (J. C. Penney) who leases the equipment. The lease was for a 36-month term expiring in July 1983. Under the lease, *496 J. C. Penney was obligated to make lease payments of $ 13,655 per month. 2. The Leasing Company Sells the Equipment to AARK
On November 27, 1980, pursuant to a written purchase agreement, AARK purchased from DPF the 17 units of computer equipment that DPF had purchased from IBM, and in which petitioner subsequently purchased a one-third interest. AARK made a cash downpayment of $ 3,112.53 and gave DPF a $ 204,389.47 promissory note payable over 10 years for the one-third interest which was, in turn, sold to petitioner. AARK's promissory note, dated November 27, 1980, was a full recourse promissory note which bore interest at approximately 12.62 percent per year. Interest only was payable during the first 18 months, which was prepaid at closing in the amount of $ 23,862.47. Thereafter, monthly installments of principal and interest of $ 3,494.25 were payable for 102 months (i.e., the 19th through 120th months following the close of the transaction). The promissory note was secured by a security agreement which created a purchase money security interest in favor of DPF in the computer equipment and the proceeds from the equipment. In the event AARK did not make timely *497 payments to DPF, DPF was required to proceed against the collateral prior to exercising its rights against AARK. Pursuant to AARK's promissory note, AARK had the right of setoff for any liabilities DPF may have had to AARK and the right to defer payment of principal and interest on the note as such payments became due if, and to the extent, DPF failed to honor certain covenants contained in the November 27, 1980, purchase agreement. DPF also assigned its right to receive payments from the end user, J. C. Penney, to AARK. The equipment remained subject to the J. C. Penney lease and a lien of DPF's bank creditor. 3. The Equity Owner's Purchase of the Equipment
On November 28, 1980, petitioner purchased his one-third interest in the equipment from AARK for a total purchase price of $ 207,502 (the same amount AARK had agreed to pay DPF with respect to one-third of the equipment). Petitioner made a cash downpayment of $ 6,694 and executed a 10-year promissory note in favor of AARK in the amount of $ 200,808. The promissory note bore interest at 15 percent per year and was payable in 102 monthly installments of $ 3,494.25 beginning with the 19th month after closing and *498 ending the 120th month after closing. Although monthly installment payments were not to commence until 19 months after closing, petitioner was obligated to make payments prior to this time. The first payment due on the installment note, in the amount of $ 45,182, was allocated to prepaid interest. Petitioner discharged this obligation by delivering to AARK $ 182 in cash at closing [7] and executing promissory notes in the amount of $ 25,000 and $ 20,000, which were due June 15, 1981, and December 31, 1981, respectively, both of which bore interest at 13.5 percent and were secured by a letter of credit. Petitioner paid the $ 25,000 note, with interest, on June 15, 1981, and the $ 20,000 note, with interest, on July 22, 1982, the maturity date of such note having been extended to June 30, 1982. The purchase agreement between petitioner and AARK provides that the interest of petitioner in the equipment was subordinate to the interest of J. C. Penney, the DPF lien, and a lien of DPF's bank creditor. Further, petitioner executed a security agreement in the equipment in favor of AARK. *499 Petitioner did not directly assume any of AARK's obligations to DPF or any of DPF's obligations to its creditor. However, petitioner signed a recognition agreement with DPF in which DPF agreed to give petitioner written notice of AARK's failure to make any payment on its obligation to DPF. Petitioner had 30 days from receipt of such notice to notify DPF that he would assume AARK's obligations and that he intended to make the required payments directly to DPF. Petitioner's right to cure AARK's default was absolute, and DPF waived any right or remedy it had against AARK until notice was given to petitioner and the 30-day period for petitioner to cure AARK's default had expired. The same day petitioner entered into the purchase agreement with AARK, AARK assigned its interest in the J. C. Penney lease payments to petitioner and petitioner entered a net lease agreement with DPF. Pursuant to the lease agreement, petitioner agreed to lease the equipment "as is" and "where is," back to DPF for 10 years. DPF agreed to pay petitioner $ 52.00 per month during months one through 18 and $ 3,546.25 per month during months 19 through 120. An addendum to the lease, executed concurrently *500 with the lease, provides that, in addition to the fixed lease payments set forth above, DPF would pay petitioner 25 percent of all rental income received from end users in the sixth through tenth year of the lease, net of DPF's expenses related to the sublease of the equipment. Also on November 28, 1980, petitioner entered into a remarketing agreement with DPF in which DPF was designated as petitioner's exclusive agent for purposes of remarketing the equipment, either for sale or lease, at the expiration of the 10-year lease between petitioner and DPF. DPF's compensation for remarketing was to be 20 percent of any proceeds from a sale or lease of the equipment, less all reasonable expenses. The remarketing agreement did not affect the end-user lease with J. C. Penney but obligated DPF to remarket the equipment at its fair market value or at a value "reasonably acceptable" to petitioner. AARK expected to profit on its resale of the equipment to petitioner based upon the spread in interest rates between AARK's obligation to DPF and petitioner's obligation to AARK. Petitioner did not keep in regular contact with DPF during the term of the J. C. Penney lease, which was to expire *501 in July, 1983, because he felt that since the equipment was on lease, he had no reason to be concerned about it. Approximately two to three months prior to the expiration of the J. C. Penney lease, petitioner contacted DPF and learned that J. C. Penney would be returning the equipment and that DPF would use its best efforts to re-lease the equipment. Subsequent to the expiration of the J. C. Penney lease, petitioner kept in regular contact with DPF. At the time of trial, 14 of the 17 pieces of the equipment were leased to various parties at a total gross rent of $ 1,648.84 per month. [8] The remaining three pieces were in a warehouse and "off rent." Expert Opinions
Both petitioner and respondent retained appraisers to evaluate the residual value of the computer equipment in issue and the financial viability of the transaction. The report by respondent's appraiser, dated October 10, 1986, was prepared by the staff of American Technology Appraisal Service (ATAS), a division of American Computer Group, Inc., under the supervision of Jonathan C. Moody and S. Paul Blumenthal. *502 ATAS has 14 years of appraisal experience. Petitioner's expert witness report, dated October 28, 1986, was prepared by Svend Hartmann (Hartmann). He has been the president of Computer Merchants, Inc. (CMI) since 1974 and has been with the company since 1965. Throughout his tenure at CMI, Hartmann has been involved in buying, selling, and leasing computer equipment. Since 1970, he has been the editor of a publication regarding price and market information for both new and used computer equipment. CMI is primarily a dealer of used IBM computer equipment, but it is also a lessor of IBM computers and peripheral equipment. Both experts determined the list price and appraised the fair market value of the equipment as of November 1980. Based upon their knowledge of the market in 1980, the experts valued petitioner's one-third interest in the 15 units of IBM 3350 series disk drives and the 2 units of IBM 3830-2 storage control units as follows: IBM List Price
Fair Market Value
Appraiser
November, 1980
November, 1980
Respondent's
$ 206,657
$ 185,579 *
Petitioner's
$ 206,502
$ 198,475 - $ 217,377
*503 In determining fair market and residual values of the equipment, respondent's expert considered the following factors: 1) current and future supply and demand; 2) price history; 3) mobility, or ease of removal and reinstallation of equipment; 4) availability of equipment; 5) availability of support, including the size of the maintenance organization; 6) trading activity; 7) market competition; 8) technological developments; 9) manufacturer's production capabilities and rate of replacement of used equipment; and 10) financial history, current and future financial status of the manufacturer or marketer of equipment or software under analysis, and quality of management. Among the factors considered by petitioner's expert were the following: historical data and trends, expected advances in technology, general market conditions, and anticipated actions of the manufacturer. Respondent's expert expected the IBM 3350 disk drives to be "economically obsolete" by 1986 and the IBM 3830-2 to reach "nil value" in 1986. The forecast of respondent's expert was based largely on a breakthrough anticipated by him in bubble memory and optical disk and laserbeam technology. The anticipated breakthrough *504 did not occur. Respondent's expert admitted that his projected value of $ 707 in 1986 for the IBM model 3830 "missed the mark"; in 1986, such units actually had a market price of $ 3,500. With respect to the IBM model 3350, respondent's forecast of economic obsolescence in 1986 was based upon his presumption that technological breakthroughs and new products would rapidly erode the value of the units purchased by petitioner. Petitioner's expert, on the other hand, testified that future technological breakthroughs were "not imminent," and that technological improvements would steadily occur as opposed to occurring by a breakthrough that would cause significant obsolescence to magnetic disk drives such as the IBM 3350. Petitioner's expert explained that IBM peripheral equipment has generally retained its value on the used market better than have central processing units, partly because IBM replaces worn parts at no cost to the user if the equipment is covered by an IBM service contract. Moreover, petitioner's expert noted that compared to warehoused equipment, peripheral equipment that is on lease has added value, and therefore costs more, because it is in place and has the potential *505 for additional lease revenue from the user beyond the initial term of the lease, through either renewals or continuations. Computer equipment users tend to continue their leases because it is costly and inconvenient to purchase or lease new equipment, train personnel in new products, remove existing equipment, and install new equipment. The value of leased equipment is further enhanced because much of the initial costs have already been incurred, i.e., delivery and installation costs, financing costs, and costs incurred in locating a user. Petitioner's expert placed a premium attributable to a portfolio of installed computer equipment of approximately 5 to 15 percent over the market value of comparable equipment sold on the market. Petitioner's expert believed that, in 1980, the magnetic disk technology used in the IBM model 3350 disk drive was expected to remain the dominent technology for large data files. His analysis of 1980 market conditions showed a strong demand for additional storage capacity, and prices for used IBM model 3350 disk drives were increasing. He concluded that, in 1980, the IBM model 3350 disk drive was holding its value better than previous models of IBM *506 disk drives and that most forecasters at that time predicted that the model 3350 would have a value until the end of the 1980's and beyond, and some were predicting a residual value of as much as 30 percent in 1990. Based on the 1980 market, petitioner's expert stated that he would have considered a "lifespan on the used market for 3350s of more than 15 years to be a reasonable proposition." He said, "3350s are still found in numerous large data centers, and they are likely to remain useful to many users for several more years. Based on my knowledge of the 1980 market and my knowledge of what other experts would have predicted, I conclude that an investor in 1980 could reasonably have expected a substantial residual value of a 3350 lease portfolio in 1990." Respondent's expert acknowledged that even equipment with no residual value may have rental value because of a convenience factor. He also acknowledged that IBM model 3350 disk drives are a prime example of equipment increasing in value; such units subsequently sold for as much as 125 percent of list price. A projection prepared by AARK entitled "Annual Lease Income and Debt Amortization," which petitioner reviewed before *507 investing in the equipment, projected that petitioner would realize a profit of $ 24,944 at the end of 10 years from engaging in the computer leasing transaction. The projected profit was computed as follows: Rental Income: Rent
$ 362,654
Rent Participation
37,380
$ 400,034 Residual Value
33,200 $ 433,234 Less: Costs of Acquisition
Cost of Equipment
$ 207,502
Cost of Financing
200,788 $ 408,290) Total Profit:
$ 24,944 The projection was based upon the following assumptions: that petitioner would receive rental income as provided from DPF; he would receive 25 percent of the re-lease income; the equipment would be sold at a residual value of 20 percent of the purchase price; and petitioner would receive 80 percent of such residual value. The rent participation forecast in the projection was based upon the assumption that DPF would sublease the equipment in the fifth year of its lease for $ 29,904 per year ($ 29,904 x 25% = $ 7,476; $ 7,476 X 5 years = $ 37,380). Substantive Issues Presented
During the years in issue, petitioner reported gross income *508 from his investment in the computer equipment as follows: Year
Gross Income
1980    52
1981
676
1982
25,084
The controversy herein arises out of respondent's disallowance of the following deductions claimed by petitioner with respect to his investment in the computer equipment: Expense
1980
1981
1982
Depreciation
$ 31,125
$ 52,913 $ 37,039
Interest
2,510
30,121 34,208
Total
$33,635
$ 83,034 $71,247
In 1985, petitioner reported a profit of $ 1,941 from the computer leasing transaction. Respondent disallowed petitioner's claimed deductions based upon his contentions that 1) the transaction was a sham, 2) petitioner did not acquire the benefits and burdens of ownership in the equipment, 3) petitioner did not enter the transaction for profit, and 4) petitioner was not at risk with respect to the debt obligations he incurred in connection with the transaction. Petitioner admits that he knew he would recognize tax savings in the initial period of the transaction but contends he also recognized there would be a turnaround point at which time he would be required to pay taxes with respect to *509 the transaction. Petitioner further contends that the transaction was a genuine multiparty transaction with economic substance and that he acquired the benefits of immediate cash flow, of participating in sublease revenues after five years, and of realizing gain on the sale or re-lease of the equipment. Finally, petitioner maintains that his primary objective in engaging in the transaction was to make a profit. OPINION I. Sham Transaction
Respondent's primary contention is that petitioner should not be treated as the owner and the lessor of the equipment for Federal income tax purposes because petitioner's transactions were tax-avoidance schemes devoid of economic substance. Taxpayers are generally free to structure their businesss transactions as they wish, even if motivated by tax reduction considerations. Gregory v. Helvering, 293 U.S. 465 (1935); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 196 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985). However, it is well settled that a transaction entered into solely for the purpose of tax reduction which is without economic, commercial, or legal purpose *510 other than the expected tax benefits is an economic sham without effect for Federal income tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561 (1978); Larsen v. Commissioner, 89 T.C. 1229 (1987); Rice's Toyota World, Inc. v. Commissioner, supra at 196; Grodt v. McKay Realty v. Commissioner, 77 T.C. 1221, 1243 (1981). Nevertheless, the existence of tax benefits accruing to an investor does not necessarily deprive a transaction of economic substance. Frank Lyon Co. v. United States, supra; Estate of Thomas v. Commissioner, 84 T.C. 412, 432 (1985). In the sale and leaseback context, the nonuser-owner who receives tax benefits must specifically establish that the entry into the transaction was motivated by a business purpose to justify the form of the transaction and that the transaction was supported by economic substance. Rice's Toyota World, Inc. v. Commissioner, supra at 201-203. The tests developed under the sham transaction doctrine are applied to determine whether a threshold level of business purpose or economic substance is present. Rice's Toyota World, Inc. v. Commissioner, supra at 196. *511 Specifically, in sale-leaseback transactions, the form of such transactions will be respected for Federal tax purposes as long as the lessors retain significant and genuine attributes of traditional lessors. Frank Lyon Co. v. United States, supra at 584; Levy v. Commissioner, 91 T.C. 838 (1988); Estate of Thomas v. Commissioner, supra at 432. However, we must disregard sale-leaseback transactions as economic shams where we find that investors entered into such transactions with the sole purpose of obtaining tax benefits and where the transactions are devoid of economic substance because no reasonable opportunity for economic profit existed, exclusive of tax benefits. Levy v. Commissioner, supra; Torres v. Commissioner, 88 T.C. 702, 718 (1987); Rice's Toyota World v. Commissioner, supra at 209-210; Estate of Thomas v. Commissioner, supra at 438-439. Our inquiry of business purpose and economic substance is inherently factual. Torres v. Commissioner, supra at 702; Bussing v. Commissioner, 88 T.C. 449 (1987), *512 supplemental opinion 89 T.C. 1050 (1987). The focus of our inquiry is to perform an objective analysis of the transactions to determine whether any realistic opportunity for economic profit existed exclusive of the anticipated tax benefits. In doing so, we analyze the transaction as a prudent investor, Rice's Toyota World, Inc. v. Commissioner, supra at 209, but in conducting such an analysis, we do not make unrealistic demands for certainty. Gefen v. Commissioner, 87 T.C. 1471, 1492 (1986). Petitioner contends that his purchase of the equipment was motivated by a business purpose and was supported by economic substance. In support of his position, petitioner relies upon the fact that he acquired the benefits of immediate cash flow and participation in sublease revenues with DPF. In addition, petitioner relies upon his purchase of the equipment at approximately fair market value, the residual value of the equipment, and the genuine and recourse nature of his debt obligation. In summary, petitioner contends that the transaction should be respected for Federal income tax purposes and that he is entitled to all of his claimed tax *513 benefits. Respondent, on the other hand, argues that the transaction lacked business purpose, that petitioner entered the transaction solely to obtain tax benefits, and that the transaction lacked economic substance. In short, respondent contends that the transaction was a sham for Federal tax purposes. In support of his position, respondent contends that there was no possibility of petitioner's deriving an economic profit from the transaction. Drawing a precise line of demarcation between valid and invalid transactions is invariably difficult. Rice's Toyota World v. Commissioner, supra at 197. In this context, petitioner bears the burden of proof, as respondent's determination that the transaction was simply a tax-avoidance scheme devoid of economic substance is presumptively correct. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). A. Business Purpose
Based on our review of the record herein, we conclude that the transaction was motivated by a business purpose. Petitioner approached his decision to invest in the computer equipment in a businesslike manner. Petitioner's education and work experience provided him with *514 the background for evaluating the investment in the computer equipment; he received an accounting degree and, as of 1980, had worked over 14 years for an electronics distributing company. He had undertaken numerous investments in the past and had an established modus operandi for evaluating proposed investments. In conformance with this modus operandi and prior to making his investment decision, he thoroughly investigated the transaction and literature regarding the equipment involved in the transaction. Petitioner carefully analyzed all of the documents he received, including an appraisal which reflected that the equipment would retain 20 percent of its purchase price 10 years from its purchase. Petitioner also analyzed the cash flow he would derive from the transaction. Moreover, petitioner relied upon the advice of two long-time friends with whom he had previously engaged in numerous and diverse business transactions. Petitioner respected the advice of Lifton and Weingrow (who also invested in the transaction) because he considered them to be thorough, honest businessmen. He was aware that they had made a comprehensive review of the transaction before recommending it. Petitioner's *515 respect for their business acumen was no doubt bolstered by the fact that the vast majority of the transactions in which he engaged with either or both of them were financially successful. Petitioner entered into the transaction for sound business reasons, i.e., to acquire hard investment assets as a protection against inflation and to earn a profit from the exploitation of the equipment. We thus find that petitioner entered into the transaction in good faith and with a substantial business purpose. B. Economic Substance
In Levy v. Commissioner, supra at 856, we held that in analyzing whether a transaction has economic substance, the following five factors are particularly significant: 1) the presence or absence of arm's-length price negotiations, Helba v. Commissioner, affd. 860 F.2d 1075 (3d Cir. 1988); see also Karme v. Commissioner, 73 T.C. 1163, 1186 (1980), affd. 673 F.2d 1062 (9th Cir. 1982); 2) the relationship between the sales price and the fair market value, Zirker v. Commissioner, 87 T.C. 970, 976 (1986); Helba v. Commissioner, supra at 1005-1007, 1009-1011; 3) *516 the structure of the financing, Helba v. Commissioner, supra at 1007-1011; 4) the degree of adherence to contractual terms, Helba v. Commissioner, supra at 1011; and 5) the reasonableness of the income and residual value projections, Rice's Toyota World, Inc. v. Commissioner, supra at 204-207. In November 1980, when petitioner purchased his one-third interest in the equipment, the list price of a one-third interest in such equipment was between $ 206,502 and $ 206,657; petitioner paid $ 207,502, or only $ 845 to $ 1,000 over the list price. We agree with petitioner's expert that the fair market value of such equipment was between $ 198,475 and $ 217,377. Because the equipment was on lease to J. C. Penney, a large creditworthy company, subject to a 36-month lease, petitioner did not incur the additional costs of delivery and installation. Mukerji v. Commissioner, 87 T.C. 926, 965 (1986). Petitioner also benefitted from the "inertia effect" of the lease. Thus, we find that the purchase price petitioner paid, which was reasonable and was not inflated, was the result of an arm's-length transaction between unrelated parties. Levy v. Commissioner, supra at 857; *517 Gefen v. Commissioner, supra at 1493 n. 12; Abramson v. Comissioner, 86 T.C. 360, 372 (1986). The financial risks petitioner assumed in the transaction were also reasonable. At the time he purchased the equipment, it was generating rental income as a result of the end-user lease with J. C. Penney. In addition, the equipment was expected to retain a substantial value at the end of the J. C. Penney lease at which time DPF, which had a financial interest in fulfilling its obligation, was obligated to remarket the equipment at its fair market value or at a value "reasonably acceptable" to petitioner. Furthermore, Lifton and Weingrow thoroughly investigated the financial aspects of the transaction and were satisfied that the risk associated with the transaction was reasonable for an investor in petitioner's situation. Both AARK and petitioner financed their purchases of the equipment with recourse promissory notes and cash down payments. Although a typical AARK transaction would involve the use of bank financing for the original purchase of equipment, the method of financing employed by DPF in this case is not disclosed. The cash down payment *518 and face value of the recourse notes equaled the purchase price and approximated the fair market value of the equipment. The interest rates on the recourse notes, which ranged from approximately 12.62 to 15 percent, were commercially reasonable at that time. Both AARK and petitioner were projected to earn a profit on the equipment based upon the financial structure of the transaction. AARK's profits were to be based on the spread in interest rates, and petitioner was to profit from the combination of a positive cashflow during the course of the J. C. Penney lease and from the residual value of the equipment. The participants in the transaction were not related parties, and at the time of trial it appears that each participant had made all required payments under the various promissory notes and leases. Both parties relied upon expert testimony to establish the residual value of the equipment. We are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. Chiu v. Commissioner, 84 T.C. 722, 734 (1985). We may accept or reject expert testimony as we, in our best judgment, deem appropriate. Helvering v. National Grocery Co., 304 U.S. 282 (1938); *519 Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. Based on our analysis of the transaction and the methods of evaluation employed by each expert, we find that petitioner's expert employed more credible forecasting techniques than did the expert employed by respondent. Respondent's expert witness projected that the disk drives purchased by petitioner would be "economically obsolete" by 1986 and that the storage control units would reach "nil value" in 1986. Respondent's expert witness admitted that the projections with respect to the storage control units "missed the mark." With respect to the disk drives, respondent's expert based his projection of "economic obsolescence" on his belief that technological breakthroughs and the introduction of new products would rapidly erode the value of the units purchased. In contrast, petitioner's expert testified that future technological advances would be steady, but that technological breakthroughs were not imminent. Petitioner's expert opined that the disk drives would have substantial value until the end of the 1980's and beyond and stated that some experts were predicting *520 such value to be at 30 percent of the 1980 purchase price in 1990. Further, petitioner relied upon an appraisal which reflected that in 1990 the equipment would retain 20 percent of its cost in 1980. We believe that in 1980 it was reasonable for petitioner to believe that the equipment would have a residual value in 1990 of at least 20 percent of petitioner's cost and that he would receive a significant amount of additional revenue under the lease participation agreement. In conclusion, the substance of the transaction conformed to the form employed by the participants and was commercially reasonable. The parties intended to enforce the promissory notes and agreements according to their terms. The residual values on which petitioner relied were reasonable. Thus, we conclude that petitioner was faced with a reasonable opportunity to earn a pre-tax profit in excess of his investment in the equipment and that petitioner's investment in the transaction was supported by economic substance. We agree with petitioner that the transaction was a genuine multiple-party leasing transaction motivated by a good-faith business purpose. We are not persuaded to the contrary by respondent. II. *521 The Benefits and Burdens of Ownership
The second issue for consideration is whether petitioner obtained and held sufficient benefits and burdens of ownership to be regarded as the owner of the equipment for Federal income tax purposes. Our holding that the transaction in issue was not a tax avoidance scheme devoid of economic substance does not preclude further inquiry into whether the transaction constituted a sale for Federal income tax purposes. Packard v. Commissioner, 85 T.C. 397, 419 (1985), citing Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945). Respondent contends that petitioner does not possess sufficient attributes of ownership to be considered the owner of the equipment. We disagree. The key to deciding whether a transaction constitutes a sale for Federal income tax purposes is whether the benefits and burdens of ownership passed to the purported investors. Levy v. Commissioner, supra at 860; Larsen v. Commissioner, supra at 1267; Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237. To determine whether an actual, economic investment existed, we look beyond *522 the labels attached to the transactions by the parties. Rice's Toyota World, Inc. v. Commissioner, supra at 210. In Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237, we stated: The term "sale" is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money. Commissioner v. Brown, 380 U.S. 563, 570-571 (1965). The key to deciding whether petitioners' transactions * * * are sales is to determine whether the benefits and burdens of ownership have passed * * * to petitioners. This is a question of fact which must be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attending facts and circumstances. Haggard v. Commissioner, 24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956). * * * [Footnote reference omitted.] We are satisfied that petitioner acquired the benefits and burdens of ownership and retained "significant and genuine attributes of the traditional lessor." Frank Lyon Co. v. United States, supra at 585. In previous *523 cases involving the purchase and leaseback of computer equipment, this Court has found the following factors essentially neutral in determining whether a taxpayer is the owner of property: (1) the existence of a net lease; (2) the absence of significant positive cash flow; and (3) rent geared to interest and mortgage amortization. Levy v. Commissioner, supra; Larsen v. Commissioner, supra at 1267; Estate of Thomas v. Commissioner, supra at 433-436. Factors of particular relevance in determining whether a taxpayer is the owner of property are: (1) the taxpayer's equity interest in the property as a percentage of the purchase price; (2) the existence of a useful life of the property in excess of the leaseback term; (3) renewal rental at the end of the leaseback term set at fair market rent; (4) whether the projected residual value of the equipment plus the cash flow generated by the rental of the equipment allows the investors to recoup at least their initial cash investment; (5) the expectation of a "turnaround" point which would result in the investors' realizing income in excess of deductions in the later years; *524 (6) net tax benefits during the leaseback term less than their initial cash investment; and (7) the potential for realizing a profit or loss on the sale or re-lease of the equipment. Levy v. Commissioner, supra; Larsen v. Commissioner, supra at 1267-1268; Torres v. Commissioner, supra at 721; Gefen v. Commissioner, supra at 1490-1495; Mukerji v. Commissioner, supra at 967-968; Estate of Thomas v. Commissioner, supra at 433-438. Petitioner initially invested approximately $ 6,876 in cash at the closing of his purchase of the equipment, or only three percent of its purchase price. However, approximately seven months later, he paid an additional $ 25,000 bringing his cash investment, excluding interest, to $ 31,876, or 15 percent of the purchase price. By July 22, 1982, less than 20 months after he purchased the equipment, petitioner had invested cash, excluding interest, in the equipment in the total amount of $ 51,876 or 25 percent of the purchase price. [9]
*525 Petitioner's cash investment supports a finding that he acquired the benefits and burdens of ownership in the equipment. In Frank Lyon Co. v. Commissioner, supra, a case in which we held that the taxpayer had acquired a legitimate ownership interest, the taxpayer's cash investment in the property subject to the leaseback was approximately six percent. In Larsen v. Commissioner, supra, the taxpayer's cash investment in the Irving Transactions, in which we held that the taxpayer acquired a legitimate ownership interest, was approximately 15 percent. Petitioner paid approximately fair market value for the equipment, and the indebtedness to which the equipment was subject was less than its fair market value. Thus, petitioner acquired an equity interest in the equipment that he could not prudently abandon. Estate of Franklin v. Commissioner, 544 F.2d 1045, 1048 (9th Cir. 1976), affg. 64 T.C. 752 (1975). With respect to the second factor, the relationship of the lease term to the useful life of the property, based upon our consideration of the expert testimony, we find that the useful life of the computer equipment exceeded *526 the 10 year lease term with DPF. With respect to the third factor, we note that the agreements between DPF and petitioner required that any sale or re-lease of the equipment be at fair market value or at an amount acceptable to petitioner. The fourth factor to be considered is whether the projected residual value of the equipment plus the cash flow generated by the rental of the equipment would allow petitioner to recoup at least his initial cash investment. A projection prepared by AARK indicated that petitioner could expect a profit of $ 24,944 as a result of the computer leasing transaction. We have already found the projected residual value amount of 20 percent of the purchase price to be reasonable; such amount was used by AARK in making the projection. In addition to the $ 33,200 petitioner was projected to receive from the residual value of the equipment, the projection forecasted that petitioner would receive rent participation. The forecast predicted that the annual rental income generated by petitioner's interest in the equipment was to be $ 29,904. When petitioner acquired the equipment it was on lease to J. C. Penney at nearly twice this amount ($ 13,655 per month *527 X 12 months = $ 163,860 X 1/3 (petitioner's interest) = $ 54,620 per year). Although this assumption may have been somewhat optimistic given the substantial residual value of the equipment, we find that the cash flow generated from the entire transaction was reasonable in relation to petitioner's initial cash investment. With respect to the fifth factor, we note that although the investment offered petitioner tax savings in the early years of the transaction, the depreciation and interest deductions were projected to be less than the income from the computer lease in later years, i.e., a "turnaround" point was expected to be reached. Such a turnaround point was, in fact, reached when petitioner realized a net profit of $ 1,941 from the computer leasing activity in 1985. Finally, we determine that based upon the above facts, it is clear that petitioner acquired significant benefits and burdens of ownership with respect to the computer equipment, particularly the potential to realize a profit or loss on the sale or re-lease of the equipment. See Gefen v. Commissioner, supra at 1492; Estate of Thomas v. Commissioner, supra at 434. We are *528 satisfied that, for Federal income tax purposes, petitioner should be regarded as the owner of the computer equipment during the years in issue. III. Petitioner's Profit Objective
A further basis for respondent's disallowance of petitioner's claimed interest and depreciation deductions was his determination that petitioner's investment in the computer equipment was not engaged in for profit under section 183. An activity is engaged in for profit if the taxpayer involved in it has an "actual and honest objective of making a profit." Levy v. Commissioner, supra at 871; Hulter v. Commissioner, 91 T.C. 371, 392-393 (1988); Ronnen v. Commissioner, 90 T.C. 74, 91 (1988); Dreicer v. Commissioner, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Although the taxpayer must have a bona fide objective of making a profit, his expectation of profit need not be reasonable. Allen v. Commissioner, 72 T.C. 28, 33 (1979). The issue of whether an activity is engaged in for profit is one of fact to be resolved on the basis of all the surrounding circumstances. *529 Finoli v. Commissioner, 86 T.C. 697, 722 (1986); Flowers v. Commissioner, 80 T.C. 914, 931-932 (1983). Petitioner testified that he purchased the equipment to make a profit. However, in determining whether petitioner engaged in the activity with the requisite profit objective, we give greater weight to objective factors than to taxpayer's bare statement of intent. Section 1.183-2(a), Income Tax Regs.; Beck v. Commissioner, 85 T.C. 557, 570 (1985) ; Flowers v. Commissioner, supra.
Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of relevant factors, which are in large part a synthesis of prior case law, to be considered in determining whether an activity is engaged in for profit.[10]Allen v. Commissioner, 72 T.C. at 33; Benz v. Commissioner, 63 T.C. 375, 382-383 (1974). No single factor is controlling, but rather it is an evaluation of all the facts and circumstances in the case, taken as a whole, which is determinative. Section 1.183-2(b), Income Tax Regs.; Abramson v. Commissioner, 86 T.C. 360, 371 (1986). Because we have already discussed *530 many of these factors in reaching our conclusion that the transaction was economically viable and was not a sham, we shall only briefly comment upon the factors we find particularly persuasive. Petitioner and his advisors, Weingrow and Lifton, all of whom were experienced investors, carefully analyzed documentation, industry trends, and viability of the other participants with respect to the transaction. Petitioner was experienced in the electronics industry; he had worked for an electronics distributing firm *531 for numerous years and had taken computer courses in college. Petitioner purchased peripheral equipment because he believed such equipment would retain its value better than mainframe equipment; and although the transaction resulted in losses in its early years, a turnaround point was reached in 1985, at which time the transaction resulted in a profit. Finally, petitioner had successfully entered into other diverse investments with Weingrow and Lifton. As a result of our analysis of the record before us, we conclude that petitioner engaged in the transaction in issue with the actual and honest objective of making a profit. IV. At Risk Issue
The next issue for our consideration is whether petitioner was at risk within the meaning of section 465 with respect to the debt obligation he incurred in connection with the computer leasing transaction. Section 465 provides that where an individual taxpayer or closely held corporation engages in the leasing of depreciable property, any loss with respect to the activity is allowed only to the extent the taxpayer is financially at risk at the close of the taxable year. Sections 465(a)(1) and (c)(1)(C). Generally, a taxpayer *532 is considered financially at risk with respect to an investment in a leasing activity to the extent he contributes money to the activity or incurs debt obligations with respect to which he is either personally liable for repayment or has pledged property, other than property to be used in the leasing activity, as security for the borrowed amounts. Sections 465(b)(1)(A) and (b)(2). A taxpayer will be regarded as personally liable for repayment, within the meaning of section 465(b)(2)(A) if he is "ultimately economically liable" to repay the obligations in the event funds from the investment are not available to repay the obligations. Levy v. Commissioner, supra at 863. The critical inquiry is who is the obligor of last resort, and "the scenario that controls is the worst case scenario, not the best case." The fact that other investors or entities remain in the "chain of liability" does not detract from the at-risk amount of investors who have the ultimate liability. In determining which investors are ultimately financially responsible for the obligations, the substance of the transactions controls. [Citations omitted.] Respondent first argues that the *533 presence of AARK must be disregarded because it acted as a "mere facilitator under the facts of this case," and therefore, DPF, not AARK, should be regarded as the creditor with respect to petitioner's debt obligation. Respondent further contends that, while petitioner was nominally personally liable for repayment, he should not be considered at risk with respect to the obligation because AARK had an interest in the transaction other than as a creditor and because petitioner was protected against loss with respect to the obligation. Petitioner, on the other hand, contends that he should be considered at risk for the full amount of his debt obligation to AARK because he claims that he is personally and ultimately liable for its repayment, that AARK had no continuing interest in the transaction other than as a creditor, and that he was not in any way protected against loss with respect to the obligation. A. AARK's Function in the Transaction
Respondent argues that AARK's participation in the transaction should be disregarded, and we should instead evaluate DPF's role in the transaction. Respondent relies upon Bussing v. Commissioner, supra, to support *534 his argument that the note executed by petitioner should not be included in his amount at risk. Respondent argues that Bussing v. Commissioner, supra, is "squarely applicable" to this case and that AARK played the "ephemeral role of a facilitator" whose presence should be disregarded. We disagree. The facts of Bussing v. Commissioner, supra, are readily distinguishable from the facts in this case. In Bussing, we found the transaction was not a genuine multiparty transaction. Here, we find the transaction is in fact that which it purports to be. We note that the taxpayer in Bussing was solicited by a director and officer of the corporate parent of one of the participants. The corporate parent also was involved in soliciting a middleman for the transaction, whose function was to make the transaction appear legitimate for tax purposes. In addition, the taxpayer in Bussing failed to make or receive any payments with respect to the transaction subsequent to his cash downpayment. In contrast, petitioner herein was not solicited by any of the participants to the transaction. Petitioner made and received the required payments. *535 We, therefore, find that, contrary to respondent's contention, there are no grounds for disregarding the presence of AARK and treating this transaction as other than a genuine multiparty transaction. Cf. Gralnek v. Commissioner, T.C. Memo. 1989-433. Our finding is consistent with the result we reached in Levy v. Commissioner, supra, a case factually similar to the case presently before us. B. Section 465(b)(3) - Interests Other Than as a Creditor
Amounts borrowed are not considered at risk with respect to an activity if such amounts are borrowed from any person who has an interest in the activity other than an interest as a creditor. Section 465(b)(3). Respondent implicitly acknowledges that AARK had no continuing interest in the transaction other than as a creditor with respect to petitioner's debt obligation. Respondent instead argues that DPF's right to remarket the equipment and to share in the proceeds of the sale or re-lease of the equipment constituted a prohibited interest under section 465(b)(3). The policy behind the prohibition contained in section 465(b)(3) was explained in Bennion v. Commissioner, 88 T.C. 684, 698 (1987) *536 as follows: Creditors who hold recourse obligations, but who also have certain other interests in the activity, might disregard their rights thereunder in favor of protecting or enhancing their other interests in the activity. In light of that eventuality and in spite of the otherwise recourse nature of the debt, taxpayers who owe recourse debt obligations to such creditors are not to be regarded as at risk with respect thereto. In 1979, the Treasury issued proposed regulations under section 465(b)(3) which provide that creditors will be deemed to have prohibited interests if they have either a "capital interest" in the activity or an interest in the "net profits" of the activity. Section 1.465-8(b), Proposed Income Tax Regs., 44 Fed. Reg. 32239 (June 5, 1979). [11] We have utilized these two tests as guidelines in determining whether a creditor in a transaction has prohibited other interests. Larsen v. Commissioner, supra at 1270; Bennion v. Commissioner, supra at 696; Jackson v. Commissioner, 86 T.C. 492, 529 (1986), affd. 864 F.2d 1521 (10th Cir. 1989). *537 A capital interest is described in the proposed regulations as an interest in the assets of an activity which would make the assets, or a portion thereof, distributable to the owner of the interest upon liquidation of the activity. Sec. 1.465-8(b)(2), Proposed Income Tax Regs., supra. Because DPF had no continuing capital interest in the equipment that was distributable to it upon liquidation of the activity, that provision is not applicable. An interest in the net profits of an activity may exist, under the proposed regulations, even though the lender does not possess any incidents of ownership in the activity. We have held that rights under a remarketing agreement may constitute an interest in the net profits of an activity and may violate section 465(b)(3). Levy v. Commissioner, supra at 868; Bennion v. Commissioner, supra at 698. However, under the terms of the lease and remarketing agreements between petitioner and DPF, remarketing of the equipment was not contemplated until the end of the 10-year lease term. The provisions of the various agreements among the participants in the transaction, considered as a whole, give DPF *538 rights which are too indefinite and too tenuous to constitute a prohibited interest under section 465(b) (3). Section 465(b)(3) contemplates fixed and definite rights or interests that pose a realistic threat of causing creditors to act other than as an independent creditor would act with respect to the debt obligation in question. Levy v. Commissioner, supra at 868. For the reasons stated, we conclude that DPF's interest in the remarketing agreement does not constitute a continuing interest in this transaction other than as a creditor. Having so found, and in light of respondent's implicit concession that no other creditor involved in this transaction had continuing interests other than as creditors, we find that the provisions of section 465(b)(3) have not been violated by this transaction. C. Section 465(b)(4) - Protection Against Loss
Even if a taxpayer is nominally personally liable for a debt obligation, for Federal income tax purposes he will not be considered at risk for such an obligation if his ultimate liability with respect to that obligation is protected against loss through "nonrecourse financing, guarantees, stop loss agreements, *539 or other similar arrangements." Section 465(b)(4). Although the term "other similar arrangements" is not defined in the Code, the legislative history reflects congressional concern with situations in which investors are effectively immunized against any realistic possibility of suffering an economic loss even though the underlying transaction was not profitable. Levy v. Commissioner, supra at 864; Larsen v. Commissioner, supra at 1272-1273; Bennion v. Commissioner, supra at 692; S. Rept. 94-939 (1976), 1976-3 C.B. (Vol.3) 49, 87. The analysis of whether a taxpayer is protected against loss is not controlled by labels; the issue must be resolved on the basis of who realistically will be the payor of last resort if the transaction goes sour and the secured property associated with the transaction is not adequate to pay off the debt. Levy v. Commissioner, supra at 870. Our analysis of the entire record before us, and particularly the transaction documents in question, leads us to conclude that petitioner was not protected against loss with respect to his debt obligation. The mere *540 fact that petitioner was due to receive sufficient rent from DPF to repay the principal and interest on his installment note does not amount to a guarantee, stop loss agreement, or other device to frustrate the purpose of section 465. Gefen v. Commissioner, supra.
Under the discharge provisions of petitioner's installment note to AARK, if AARK and DPF fail to utilize the proceeds of petitioner's debt payments to make their respective debt payments that are due to DPF and DPF's creditors, petitioner will not be obligated to make duplicate payments of those same amounts to DPF or to DPF's creditors. His debt obligations with respect to DPF or to DPF's creditors will be discharged because petitioner already will have paid them once (namely, to AARK). Also, if AARK becomes delinquent in its payments to DPF, petitioner (under the recognition agreement between petitioner and DPF) has the option to make his debt payments directly to DPF. In conclusion, we find that there is no basis under section 465 for limiting the deductions claimed by petitioner with respect to the years in issue. [12]
*541 V. Section 6621(c) Interest
By Amendment to Answer, respondent asserts that the petitioner is liable for additional interest under the provisions of section 6621(c) because his investment is attributable to a tax-motivated transaction. Respondent bears the burden of proof. Rule 142(a); Rose v. Commissioner, 88 T.C. 386, 423 (1987), affd. 868 F.2d 851 (6th Cir. 1989). Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate determined under section 6621(b) where there is a substantial underpayment of tax in any taxable year attributable to one or more tax-motivated transactions. Because we have held for petitioner with respect to the substantive issues in this case, the increased interest provided in section 6621(c) is inapplicable. VI. Section 6661 Addition to Tax
Section 6661 imposes an addition to tax for a substantial understatement of tax liability. Because we have found that, with respect to the issues before us, petitioner has not understated his tax liability, the section 6661 addition to tax is inapplicable. To reflect previously agreed adjustments, Decision will be entered under Rule *542 155 . Footnotes
1. Petitioner Judith Rubin was not involved in the transactions at issue and is a party to this action solely by reason of filing a joint Federal income tax return with her husband for each of the taxable years concerned. "Petitioner" shall hereinafter refer only to Leonard Rubin. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Section 6621(c) was originally designated section 6621(d) but was redesignated subsec. (c) and amended by the Tax Reform Act of 1986, Pub.L. 99-514, sec. 1511(c)(1)(A)-(C), 100 Stat. 2744. All references to such section are as redesignated and amended.↩
4. Weingrow's educational background and occupation were not disclosed.↩
5. The parties stipulated that the appraisal is not admissible to prove the accuracy of the values stated in the appraisal, but rather only to show that petitioner relied on such report in making his investment decision.↩
6. We use such terms as "owner", "purchaser", etc. for convenience and to reflect the wording of various documents. Our use of such terms is not intended to be determinative of the legal effect of any documents or transactions involved herein.↩
7. Including the cash downpayment, petitioner paid a total of $ 6,876 in cash at closing.↩
8. Of this amount, petitioner receives approximately $ 137.40 per month ($ 1,648.84 X 1/4 X 1/3).↩
*. Respondent's fair market value appraisal actually relates to December 1980.↩
9. Although the two notes represent the payment by petitioner of accrued interest, the inclusion of the amounts of such notes is appropriate in this analysis. See Levy v. Commissioner, 91 T.C. 838, 861↩ (1988).
10. These factors include: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Section 1.183-2(b), Income Tax Regs.↩
11. Sec. 1.465-8(b), Proposed Income Tax Regs., 44 Fed. Reg. 32239 (June 5, 1979) provides, in relevant part: (b) Loans for which the borrower is personally liable for repayment. -- (1) General Rule. If a borrower is personally liable for the repayment of a loan for use in an activity, the lender shall be considered a person with an interest in the activity other than that of a creditor only if the lender has either a capital interest in the activity or an interest in the net profits of the activity. (2) Capital interest. For the purposes of this section a capital interest in an activity means an interest in the assets of the activity which is distributable to the owner of the capital interest upon the liquidation of the activity. The partners of a partnership and the shareholders of a corporation described in section 1371(b) are considered to have capital interests in the activities conducted by the partnership or corporation. (3) Interest in net profits↩. For the purposes of this section it is not necessary for a person to have any incidents of ownership in the activity in order to have an interest in the net profits of the activity. For example, an employee or independent contractor any part of whose compensation is determined with reference to the net profits of the activity will be considered to have an interest in the net profits of the activity.
12. Respondent contends that Klagsburn v. Commissioner, T.C. Memo. 1988-364 mandates a different result. We disagree. As we noted in Levy v. Commissioner, supra at 870 n. 17: The various transaction documents in the record in this case contain language similar to language contained in the documents involved in Klagsburn v. Commissioner, T.C. Memo. 1988-364. The security agreement between petitioners and AARK gives AARK a "right to receive" rent payments DPF owes petitioners if petitioners fail to make timely debt payments to AARK. Klagsburn also involved a multiple-party sale-leaseback of computer equipment that DPF sold to investors through AARK. The security agreement between AARK and the investors in that case also provided that AARK had the "right to receive" DPF's monthly lease payments owed to investors if the investors became delinquent in their debt payments to AARK. Both parties in Klagsburn↩ conceded that this language (coupled with language in the installment promissory note between AARK and DPF that gave AARK the right to set off against its debt payments to DPF any "liabilities" DPF owed to AARK) constituted a protection against loss under sec. 465(b)(4). Based upon that concession, the Court went on to consider other aspects of the at-risk rules of section 465(b)(4) (namely, the effect of the potential bankruptcy of DPF on the stipulated "protection-against-loss" feature of the transaction). The Court gave no consideration to the merits of the threshold question conceded by the parties. * * *